CRYSTAL LAKE CHEESE FACTORY, Petitioner-Appellant-Petitioner,

v.

LABOR AND INDUSTRY REVIEW COMMISSION and Susan Catlin, Respondents-Respondents.

Supreme Court

*No. 02–0815. Oral argument May 28, 2003.—Decided July 11, 2003.*

2003 WI 106

(Also reported in 664 N.W.2d 651.)

201

For the petitioner-appellant-petitioner there were briefs by *Robert H. Duffy, Sean M. Scullen,* and *Quarles & Brady LLP,* Milwaukee, and oral argument by *Robert H. Duffy.*

For the respondent-respondent, Labor and Industry Review Commission, the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

For the respondent-respondent, Susan Catlin, there was a brief by *Monica M. Murphy* and the *Wisconsin Coalition for Advocacy,* Milwaukee, and oral argument by *Monica M. Murphy.*

An amicus curiae brief was filed by *Melissa A. Cherney* and *Chris Galinat,* Madison, on behalf of the Wisconsin Education Association Council.

An amicus curiae brief was filed by *Rebecca L. Salawdeh* and *Urban Taylor & Stawski, Ltd.,* Milwaukee; *Patrick O. Patterson* and *Law Office of Patrick O. Patterson, S.C.,* Fox Point; and *Patricia A. Lauten* and *The Schroeder Group, S.C.,* Waukesha, on behalf of the Survival Coalition of Wisconsin.

An amicus curiae brief was filed by *Francis X. Sullivan, William C. Williams,* and *Bell, Gierhart & Moore, S.C.,* Madison, on behalf of the Wisconsin Cheese Makers Associations, Inc., and Wisconsin Manufacturers and Commerce, Inc.

An amicus curiae brief was filed by *Paul A. Kinne,* Madison, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. N. PATRICK CROOKS, J. This is a review of a decision of the Court of Appeals, District III,[1] which affirmed an order of the circuit court of Barron County, the Honorable James C. Eaton presiding. The circuit court affirmed a decision of the State of Wisconsin Labor and Industry Review Commission (LIRC), which reversed an order of Administrative Law Judge (ALJ) Gary Olstad. LIRC determined that Susan Catlin (Catlin) was an individual with a disability within the meaning of the Wisconsin Fair Employment Act (WFEA), Wis. Stat. § 111.31–.395 (1999–2000),[2] and that Crystal Lake Cheese Factory had discriminated against her based on her disability within the meaning of the WFEA. LIRC found that Crystal Lake's refusal to modify Catlin's job duties to exempt her from performing the heaviest physical tasks, and to make physical modifications to the work place, constituted the denial of a reasonable accommodation, which it could have provided without hardship.

¶ 2. We are presented with the following issues: (1) whether LIRC reasonably interpreted Wis. Stat. § 111.34(1)(b)[3] and § 111.34(2)(a)[4] of the WFEA, when it found there was a reasonable accommodation Crystal

---

[1] *Crystal Lake Cheese Factory v. LIRC,* 2002 WI App 290, 258 Wis. 2d 414, 654 N.W.2d 286.

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[3] Wisconsin Stat. § 111.34(1)(b) provides:

(1) Employment discrimination because of disability includes, but is not limited to:

(b) Refusing to reasonably accommodate an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise or business.

[4] Wisconsin Stat. § 111.34(2)(a) provides:

Lake could have provided its former employee, Catlin, without hardship; (2) whether Crystal Lake was denied due process by LIRC's failure to consult with the administrative law judge; (3) whether there was substantial and credible evidence to support the factual findings made by LIRC, upon which it based its decision that there was a reasonable accommodation Crystal Lake could have provided Catlin, without hardship, within the provisions of Wis. Stat. § 111.34(1)(b) and § 111.34(2)(a).

¶ 3. We affirm the decision of the court of appeals. Accordingly, we hold that requiring Crystal Lake to modify the job duties of Catlin and make physical modifications to the workplace was not unreasonable. With such reasonable accommodations, she would have the ability to undertake, adequately, her job-related responsibilities.

¶ 4. Next, we hold that Crystal Lake was not denied due process when LIRC, prior to reversing the ALJ's holding, failed to consult with the ALJ. We hold that since LIRC's findings did not hinge on issues of witness credibility, LIRC was not required to confer with the ALJ, and that there was therefore no violation of Crystal Lake's due process rights.

¶ 5. Finally, we hold that there was substantial and credible evidence in the record to justify LIRC's findings. There was substantial evidence to show that

Notwithstanding s. 111.322, it is not employment discrimination because of disability to refuse to hire, employ, admit or license any individual, to bar or terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment, membership or licensure.

Crystal Lake could have made reasonable accommodations for Catlin, and Crystal Lake has failed to meet its burden of establishing that such reasonable accommodations for Catlin would create hardship on it.

## I. FACTUAL BACKGROUND

¶ 6. In August 1995 Catlin was hired by the Crystal Lake Cheese Factory to work in its wholesale department. The wholesale department consisted of four positions: department head, cheese cutter, cryovacer (shrink-wrapping or bagging and sealing the cheese), and labeler. The main duties of the wholesale department were to cut cheese into specified quantities and sizes according to orders. The cheese was then packaged and sealed, labeled, and boxed for shipping. Catlin was initially hired as a cheese cutter, but was later promoted to department head of the four-person department.

¶ 7. A typical day for Catlin started with her making calculations concerning the weight of the different cheeses that had to be cut, based on the orders. This took about an hour. Next, she made up labels and put them on the boxes that the orders went into. She would pull the boxes from the back, make the boxes up and put the labels on them. Meanwhile, the cutter would be cutting the cheese and placing it on the table. After the cheese was placed on the table, it was bagged and cryovaced. The cheese was bagged, sealed, and put in a basket. The basket then had to be dipped in a pot of hot water. The packages of cheese were then dried off and labeled, weighed on a scale, priced, and boxed.

¶ 8. All four workers in Crystal Lake's wholesale department were cross-trained in all four positions within the department, and all were capable of assisting

one another when an employee fell behind or when the department was busier than usual. As the department head, Catlin was required to gather orders and create an order list specifying the sizes and types of cheese that needed to be cut for that day. In addition to other administrative duties, Catlin was required to weigh, label, and box the cheese. She would also price boxes and packages, assist in the assembling of boxes, place the packages on pallets, and move them into the cooler for pickup. Catlin also assisted the other members of her department with their duties, as needed, to help control the flow of work.

¶ 9. In November 1996 Catlin was involved in a non-work related automobile accident that left her a quadriplegic, though she eventually regained partial use of both of her arms. She is now required to use a wheelchair to move around. During her hospitalization and ensuing rehabilitation period, Catlin filed for and received full disability benefits.

¶ 10. In September 1997 Catlin decided that she was ready to return to work, so she contacted Tony Curella (Curella), the president of Crystal Lake, to inquire about the circumstances of her resuming her position as department head. Crystal Lake subsequently hired David Johnson (Johnson), a management consultant of Genex Services, to determine what types of accommodations would be needed in order to allow a person confined to a wheelchair to perform the duties Catlin's position required. Curella had told Johnson that the department head had to be able to perform all of the functions in the wholesale department. Also, no one from Crystal Lake ever gave Johnson any information about Catlin, other than that she used a wheelchair. Ultimately, Johnson found that Catlin could not have been reasonably accommodated, as a person with

Catlin's disability would be unable to perform all the tasks required of her as the department head (*i.e.,* she was unable to perform all the functions of all four positions in the wholesale department). More specifically, Johnson noted that Catlin would have difficulty pulling and stocking inventory because of weight and the height of the storage area—up to seven feet above the floor. Crystal Lake therefore concluded, based on the report from Johnson, that it could make no reasonable accommodations for Catlin.

¶ 11. In October 1999 Catlin asked Crystal Lake to reconsider its decision, and in the meantime, she hired her own expert, Jeffery Annis (Annis) of the UW-Stout Assistive Technology and Assessment Center, to determine the feasibility of her returning to work as department head. At the time of this assessment, the wholesale department had been eliminated and Catlin's job no longer existed. Regardless, the assessment initiated by Catlin found that Catlin could have been accommodated, if certain physical changes had been made in the workplace, and if her job had been modified so that she would not have been required to perform those physical aspects of her job that she was no longer able to perform.

¶ 12. Like Johnson, Annis found that Catlin would be unable to perform some of the duties of her position that required climbing, lifting, or performance in a standing position. For example, she could not lift 40–pound blocks of cheese or reach cheese stored on a high shelf. Nevertheless, the assessment stated that she was still capable of performing most of her job-related duties. Due to the inability to modify some of the above job duties, the assessment suggested that an easier way

209

to accommodate Catlin would be to make her job more clerical, and eliminate many of the physical duties. The assessment recommended that Catlin's job duties be modified so that as a lead person she need do only the paperwork and final packaging, along with filling out invoices, receipts, and packing lists. Both before Catlin's accident and at the time she attempted to return to work, her mother and her sister were employed in the wholesale department as part of the same team that Catlin led.

¶ 13. When Catlin realized that she would not be allowed to resume her position as the department head at Crystal Lake Cheese Factory, she filed a charge of disability discrimination with the United States Equal Employment Opportunity Commission, and the charge was cross-filed with the Equal Rights Division of the Wisconsin Department of Workforce Development. This occurred in March of 1998. Catlin alleged that Crystal Lake violated the WFEA by terminating her employment, and by refusing to permit her to return to work because of her disability. The federal filing was subsequently dismissed by notice sent on April 27, 1998.

## II. PROCEDURAL BACKGROUND

A. Administrative Law Judge's Decision

¶ 14. An Equal Rights Division hearing was held before the ALJ on January 25, 2000. At the hearing, Phillip Robertson, Crystal Lake's operations manager, testified to some of the costs in modifying the factory to accommodate Catlin. Crystal Lake asserted that these costs were unreasonable. In October 2000 Olstad determined that Crystal Lake had not discriminated against Catlin in refusing to allow her to return to work

following her automobile accident. He found there were no reasonable accommodations that Crystal Lake could have made, without imposing on it a hardship. Consequently, Olstad determined that Crystal Lake had not violated the WFEA.

B. Labor and Industry Review Commission's Decision

¶ 15. Catlin appealed the ALJ decision to LIRC. In July 2001 LIRC reviewed the case and reversed the ALJ's ruling. LIRC did not consult with the ALJ regarding the credibility of the witnesses because LIRC believed that its reversal of the examiner's decision was not based upon any differing assessment of witness credibility. It found that Crystal Lake could have made reasonable accommodations in the factory and modifications to Catlin's duties that would have allowed Catlin to return to work as the department head. LIRC found that as of the day that Catlin sought reinstatement she was physically able to perform most of the jobs in the wholesale packing department; LIRC, Fair Employment Decision, Finding 14, p. 3 (May 5, 2000), but that she could not perform some of the heaviest physical tasks. *Id.,* Finding 15, p. 4. More specifically, LIRC found that Crystal Lake could have altered Catlin's job duties and exempted her from certain activities that she was no longer physically capable of performing, and that doing so was well within the bounds of reasonable accommodation. LIRC determined that the refusal to modify Catlin's job duties to exempt her from performing the heavier physical tasks, constituted a denial of a reasonable accommodation that Crystal Lake could have provided without hardship. *Id.,* Finding 16, p.4. In a memorandum opinion explaining its findings, LIRC stated in part: LIRC has "previously found that it is reasonable to require an

employer to restructure the physical demands of the job in order to accommodate a disabled employee, provided this can be achieved without hardship to the employer." *Fields v. Cardinal TG Co.*, ERD Case No. 1997–02574 (LIRC, Feb. 16, 2001).

¶ 16. LIRC also found that, in order to perform her job duties, Catlin needed some physical modifications to the workplace. LIRC, Fair Employment Decision, Findings 17–18, pp. 4–5 (May 5, 2000). LIRC determined that Crystal Lake's refusal to make physical modifications also constituted denial of a reasonable accommodation that Crystal Lake could have provided without hardship. *Id.*, Finding 19, p. 5. Furthermore, LIRC found that at the time Catlin sought to return to work she did not even need an accessible bathroom.[5] Thus, the cost of putting in an accessible bathroom, even if it was $47,000 as the employer claimed, was not a basis upon which Catlin could lawfully be denied reinstatement. LIRC ordered Crystal Lake to reinstate Catlin, provide "make whole" remedies[6] to her, and pay reasonable attorney's fees and costs.

C. The Circuit Court Decision

¶ 17. On August 16, 2001, Crystal Lake filed for judicial review of LIRC's decision, and on February 7,

---

[5] Catlin was "catheterized" when she first sought reinstatement, but by the time of LIRC's review she was using a bathroom. LIRC, Fair Employment Decision, Finding 18, p. 5 (May 5, 2000).

[6] LIRC ordered Crystal Lake to pay Catlin the sum she would have earned as an employee from the date she sought reinstatement until she resumed employment with Crystal Lake, refused a valid reinstatement offer, or it was shown that reinstatement was not feasible.

2002, the circuit court affirmed LIRC's decision. It found that LIRC had reasonably interpreted the WFEA, and that there was substantial and credible evidence in the record to support LIRC's findings.

D. The Court of Appeals' Decision

¶ 18. Crystal Lake appealed to the Wisconsin Court of Appeals, District III. On October 8, 2002, the court of appeals affirmed and, thus, upheld LIRC's decision.

█

¶ 19. Applying the great weight standard of review, the court of appeals concluded that LIRC's interpretation of Wis. Stat. § 111.34(1)(b) was acceptable when it found that Crystal Lake's refusal to modify Catlin's duties to exempt her from the heaviest physical tasks constituted a denial of reasonable accommodation. The court of appeals concluded that LIRC reasonably interpreted the reasonable accommodation provision of the WFEA to mean that an employer may be required to modify some job responsibilities of a disabled employee who can perform some or most (but not all) job-related functions, unless the employer can show that such modifications would cause a hardship.

¶ 20. The court of appeals found that Crystal Lake had presented no evidence showing that accommodating Catlin's disability would create a hardship. The court of appeals also concluded that LIRC did not deny Crystal Lake due process when it rejected some of the ALJ's factual findings and failed to consult with him. Finally, the court of appeals declined to remand the case in order to give Crystal Lake the opportunity to show hardship.

¶ 21. Crystal Lake petitioned for review of the decision of the court of appeals and we granted review on February 19, 2003.

## III. ISSUES

¶ 22. As noted, we are presented with the following issues: (1) whether LIRC reasonably interpreted Wis. Stat. § 111.34(1)(b) and Wis. Stat. § 111.34(2)(a) of the WFEA when it found that there was a reasonable accommodation Crystal Lake could have provided its former employee, Catlin, without hardship; (2) whether Crystal Lake was denied due process by LIRC's failure to consult with the administrative law judge; (3) whether there was substantial and credible evidence to support the factual findings made by LIRC, upon which it based its decision that there was a reasonable accommodation Crystal Lake could have provided Catlin, without hardship within the provisions of Wis. Stat. § 111.34(1)(b) and § 111.34(2)(a).

## IV. STANDARD OF REVIEW

¶ 23. Crystal Lake argues that a de novo standard of review is appropriate for LIRC's decision. In support of the de novo standard, Crystal Lake contends that the issue of whether reasonable accommodation under the WFEA includes a duty to create a new job for a disabled employee is one of first-impression for LIRC. Alternatively, Crystal Lake argues that LIRC's decision in this case is inconsistent with its previous decisions on other matters. Accordingly, based on *Kannenberg v. LIRC,* Crystal Lake maintains that if an issue is one of first-impression before the agency, or the agency's position is inconsistent with other decisions on the matter,

de novo is the appropriate standard of review. *Kannen-berg v. LIRC,* 213 Wis. 2d 373, 385–86, 571 N.W.2d 165 (Ct. App. 1997). Crystal Lake also maintains that LIRC's interpretation is in direct conflict with decisions from the Wisconsin Personnel Commission and federal courts interpreting analogous federal anti-discrimination laws.

¶ 24. The respondents, LIRC and Catlin,[7] disagree and argue that LIRC's determination that Crystal Lake could have made reasonable accommodations that would have allowed Catlin to continue working as the department head, is entitled to "great weight" deference, and must be affirmed if it is reasonable and not contrary to the clear meaning of the statute. *See Target Stores v. LIRC,* 217 Wis. 2d 1, 13–14, 576 N.W.2d 545 (Ct. App. 1998). This is true even if the court were to conclude that another interpretation was more reasonable. *See id.*

¶ 25. Catlin argues that if LIRC's interpretation is reasonable, then the reviewing court must affirm its decision under the great weight standard of review. In support of this argument Catlin maintains that the weight and credibility of the evidence are matters for the agency, and not for the reviewing court, to evaluate. *See Bucyrus-Erie Co. v. ILHR Dep't.,* 90 Wis. 2d 408, 418, 280 N.W.2d 142 (1979); Wis. Stat. § 227.57(6). Even when more than one inference can reasonably be drawn, the finding of the agency is conclusive. *See Vocational Tech. & Adult Educ. Dist. 13 v. ILHR Dep't.,* 76 Wis. 2d 230, 240, 251 N.W.2d 41 (1977).

---

[7] Hereinafter, the respondents will usually be referred to collectively as Catlin.

¶ 26. Moreover, Catlin argues that if an agency's decision depends on any fact found by the agency, the court shall not substitute its own judgment as to the weight of the evidence of any finding of fact for that of the agency. Wis. Stat. § 227.57(6). Additionally, relying on Wis. Stat. § 227.57(10),[8] Catlin argues that great weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved.

¶ 27. According to Wis. Stat. § 227.57(6),[9] LIRC's decision may be reviewed by a court and will only be set aside or remanded to the agency "if [the court] finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." "Substantial evidence does not mean a preponderance of the evidence. Rather, the test is whether, taking into account all the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.' " *Madison Gas & Elec. Co. v. Public Serv. Comm'n,* 109 Wis. 2d 127, 133, 325 N.W.2d 339 (1982)

---

[8] Wisconsin Stat. § 227.57(10) states:

Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. The right of the appellant to challenge the constitutionality of any act or of its application to the appellant shall not be foreclosed or impaired by the fact that the appellant has applied for or holds a license, permit or privilege under such act.

[9] Wisconsin Stat. § 227.57(6) provides:

If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

(citing *Sanitary Transfer & Landfill, Inc. v. DNR*, 85 Wis. 2d 1, 15, 270 N.W.2d 144 (1978)). The reviewing court may not substitute its judgment for that of an agency in a contested case as to the weight of evidence on any disputed finding of fact.

¶ 28. A reviewing court must first determine what level of deference to accord an agency decision. If the agency's determination is entitled to great weight, a court will sustain it unless it directly contravenes a statute, is clearly contrary to legislative intent, or lacks a rational basis. *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995). Here, any decision made by LIRC will be given great weight due to the agency's knowledge and experience in application of Wis. Stat. § 111.34. *Target*, 217 Wis. 2d at 13.

¶ 29. In *Target* the court of appeals determined that LIRC's interpretation of reasonable accommodation should be given great weight. *Id.* The court stated that "[w]e give LIRC's interpretation of a statute varying degrees of deference depending on its obligations with respect to administering the statute, its experience in doing so, and the nature of the determinations." *Id.* The court then went on to explain why it concluded great weight should be given to LIRC's interpretation of reasonable accommodation:

> First, LIRC is charged with adjudicating appeals from the hearing examiner's decision on complaints under the WFEA, § 111.39(5), Stats., which includes complaints under § 111.322, Stats., for handicap discrimination. Second, § 111.34(1), Stats., was enacted in 1981 and LIRC has developed experience and expertise in interpreting this section. . . . Third, by according great deference to these determinations, we will promote greater uniformity and consistency than if we did not

do so. Fourth, this determination is intertwined with factual determinations, *see McMullen v. LIRC,* 148 Wis. 2d 270, 276, 434 N.W.2d 830, 833 (Ct. App. 1988) (what is reasonable accommodation depends on the facts in each case). Fifth, this determination involves value and policy judgments about the obligations of employers and employees when an employee, or prospective employee, has a handicap. See *Kannenberg,* 213 Wis. 2d at 385, 571 N.W.2d at 171.

*Id.,* (some citations omitted).

¶ 30. We agree with the standard of review set forth in *Target,* and hold that LIRC's interpretations, including its determination of reasonable accommodation in this case, should be given "great weight" deference.[10] In doing so, we reject Crystal Lake's contention that the issue was one of first impression, or that its position is inconsistent with other decisions on the matter. LIRC has had many opportunities to address this issue of what reasonable accommodation is under the WFEA. "Under the great weight standard of review, we uphold LIRC's interpretation of the statute if it is reasonable and not contrary to the clear meaning of the statute, even if we conclude that another interpretation is more reasonable." *Id.* at 13–14.

[10] The dissent argues for application of the due weight deference standard of review, which it characterizes as one which allows the reviewing court to accept "an alternative interpretation that is more reasonable." Dissent, ¶ 108. While we believe that great weight deference is appropriate here, even under a due weight deference standard, our approval of LIRC's interpretations of the statutory sections involved would not change. Its interpretations are "more reasonable" than the alternatives offered by Crystal Lake.

## V. ISSUE ONE—LIRC'S INTERPRETATION OF REASONABLE ACCOMMODATION WITHOUT HARDSHIP AND ABILITY TO UNDERTAKE JOB RESPONSIBILITIES

¶ 31. As noted previously, Wis. Stat. § 111.34 states:

Disability; exceptions and special cases

(1) Employment discrimination because of disability includes, but is not limited to:

. . . .

(b) Refusing to reasonably accommodate an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise or business.

(2)(a) Notwithstanding s. 111.322, it is not employment discrimination because of disability to refuse to hire, employ, admit or license any individual, to bar or terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment, membership or licensure.

¶ 32. The statutory language of Wis. Stat. § 111.34 requires that an employer must show the individual's disability "is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment . . . ." Wis. Stat. § 111.34(2)(a). However, an em-

219

ployer violates the WFEA if it refuses to reasonably accommodate an employee's disability without demonstrating that the accommodation would be a hardship on it. Wis. Stat. § 111.34(1)(b). Taken together, § 111.34(1)(b) and (2)(a) require an employer to prove that even with reasonable accommodations, the employee would not be able to perform his or her job responsibilities adequately or that, where reasonable accommodations would enable the employee to do the job, hardship would be placed on the employer. *Target,* 217 Wis. 2d at 17.

## A. Arguments

¶ 33. Crystal Lake argues that LIRC's interpretation of reasonable accommodation under the WFEA is unreasonable and erroneous. The WFEA does not define reasonable accommodation or the extent to which an accommodation may be required for a disabled employee. Moreover, Crystal Lake contends that there is little guidance from Wisconsin's appellate courts regarding the scope of reasonable accommodation under the WFEA. *See id.* at 17. Relying on *Target,*[11] Crystal Lake argues that eliminating the duties of an employee's position is not an accommodation that enables the disabled employee to "adequately undertake job-related responsibilities" of her employment.

¶ 34. Crystal Lake maintains that neither LIRC, nor Catlin's expert, suggests that there is any such accommodation that would have allowed Catlin to do her job. Instead, Crystal Lake claims that LIRC re-

---

[11] In *Target,* the court of appeals held that "the purpose of reasonable accommodation is to enable employees to adequately undertake job-related responsibilities." *Target Stores v. LIRC,* 217 Wis. 2d 1, 17, 576 N.W.2d 545 (Ct. App. 1998).

quired Crystal Lake to excuse Catlin from those duties she could no longer perform, essentially creating a new job. Under the statutory language of the WFEA, Crystal Lake argues that an employee must be able to "adequately undertake the job-related responsibilities of [the] individual's employment. . . . " Wis. Stat. § 111.34(2)(a).

¶ 35. Next, Crystal Lake argues that the legislature's use of the definite article, "the" in Wis. Stat. § 111.34(2)(a), without modification, can only be reasonably interpreted to mean all of the functions that make up the job. The use of the article "the," Crystal Lake contends, is contrary to the interpretation adopted by the court of appeals in this case, where the court found that as long as the employee could perform "some" of the job-related responsibilities, the employer is obligated reasonably to accommodate the employee by eliminating those tasks which the employee can no longer do. *Crystal Lake Cheese Factory v. LIRC,* 2002 WI App 290, ¶ 26, 28–29, 258 Wis. 2d 414, 654 N.W.2d 286.

¶ 36. Crystal Lake contends that this court should look to analogous federal statutes and the Wisconsin Personnel Commission in interpreting reasonable accommodation, even though neither the court, nor LIRC, is bound by those decisions in interpreting Wis. Stat. § 111.34(1)(b) and (2)(a). *See Target,* 217 Wis. 2d at 18–19; *Kannenberg,* 213 Wis. 2d at 387. In support of its argument, Crystal Lake points out that federal courts have routinely held that reasonable accommodation does not require an employer to eliminate job duties, create a new job, or employ others to perform functions that a disabled employee cannot perform. *Peters v. City of Mauston,* 311 F.3d 835, 845–846 (7th

Cir. 2002); *Watson v. Lithonia Lighting,* 304 F.3d 749, 752 (7th Cir. 2002). Consequently, Crystal Lake asks us to find that the WFEA's reasonable accommodation provision does not require an employer to create a new position for a disabled employee.

¶ 37. Catlin disagrees and argues that the court should not read federal legislation into the intent of Wisconsin's legislators. Instead, Catlin maintains that the WFEA should be interpreted in accordance with "our legislature's intention rather than with the intention of other jurisdictions." *McMullen v. LIRC,* 148 Wis. 2d 270, 275–76, 434 N.W.2d 830, 833 (Ct. App. 1988). Wisconsin has determined that while federal and other states' cases applying similar legislation may be enlightening to the WFEA cases, they are not binding upon Wisconsin courts. *Id.* Thus, Catlin argues that while this court may consider how federal courts have dealt with the question of reasonable accommodation under the Americans with Disability Act (ADA), since the WFEA is similar, but not identical, guidance is limited as to the determination of what is reasonable under the WFEA. In support of its position, Catlin argues that there are significant differences in statutory language between the WFEA and the ADA. *See McMullen,* 148 Wis. 2d at 275. Catlin points out that the ADA requires an employer to make reasonable accommodations only to the disability of a "qualified individual with a disability" and a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds . . . ." *See* 42 U.S.C §§ 12111(8)[12] and

12 42 U.S.C. § 12111(8) states:

12112(5)(A).[13] The WFEA, Catlin contends, requires an employer reasonably to accommodate an employee's disability, but an "individual with a disability" is not limited to an individual who can perform the "essential functions" of the employment position with or without accommodation. *See* Wis. Stat. §§ 111.32(8)[14] and 111.34(1)(b).

¶ 38. Moreover, Catlin argues that under the ADA analysis, it is not even clear that the tasks that Catlin could no longer perform were considered essential functions of her position. Catlin points out that as the department head, her primary responsibility was to process orders and do inventory sheets—tasks which

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

[13] 42 U.S.C. § 12112(5)(A), states:

As used in subsection (a) of this section, the term "discriminate" includes: not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

[14] Wisconsin Stat. § 111.32(8) provides:

"Individual with a disability" means an individual who:

(a) Has a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work;

(b) Has a record of such an impairment; or

(c) Is perceived as having such an impairment.

she could still perform. Furthermore, Catlin asserts that Crystal Lake has offered no case law, under the ADA, that says an individual must be able to perform all functions of four different positions, or they will not be considered a qualified individual with a disability entitled to protections under the law.

¶ 39. Catlin argues that even if the ADA is considered when applying the WFEA, it makes no difference since the ADA requires an employer to engage in an interactive process with an employee to determine a reasonable accommodation, and that in the present case, no such process was undertaken.

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3) 1995.[15] Again, no such interactive process took place here. Catlin points out that Crystal Lake never inquired of her as to what accommodations she needed. Catlin argues that this failure violated the intent of the WFEA as well. Furthermore, Catlin argues that under the ADA, determining whether a function is essential includes determining whether removing the function would fundamentally alter that position if the position exists to perform a particular function, if there are other employees available to perform that function, and the amount of time spent performing the function. *Americans With Dis-*

---

[15] EEOC Regulations to Implement the Equal Employment Provisions of the ADA, 29 C.F.R. § 1630.2(o)(3) (1995).

*abilities Act Handbook,* p. I-38, U.S. Equal Employment Opportunity Commission and U.S. Department of Justice (1992). Even under this analysis, Catlin contends, it is not clear whether the few tasks Catlin was no longer able to do, even with accommodations, qualified as essential functions or marginal functions. Her position was not the cutter position nor was it the cryovacer position.

¶ 40. Crystal Lake argues that all Catlin's job functions were essential, and that not only is Catlin required to perform all the functions of her position, but it is also essential that she be able to perform all the functions of all the other employees in the department, no matter what their primary role is. Catlin argues that Crystal Lake's comment that nothing in the WFEA's legislative history "suggests an intent to construe the duty of 'reasonable accommodation' differently than under the ADA" is similarly unpersuasive, given that the WFEA's disability provisions predate the ADA by almost ten years.

¶ 41. In summary, Catlin argues that Crystal Lake is inappropriately attempting to move this case from the protections of the WFEA, and instead apply an analysis used under the ADA. The ADA distinguishes between essential and marginal functions, but the term "essential functions" has no particular meaning under the WFEA. *Target,* 217 Wis. 2d at 16–17 n.9.

¶ 42. Under the WFEA a complainant must first show that he or she is an "individual with a disability" within the meaning of Wis. Stat. § 111.32(8), and that the employer took one of the actions enumerated in Wis. Stat. § 111.322.[16] *Target,* 217 Wis. 2d at 9.

---

[16] Wisconsin Stat. § 111.322 provides:

Discriminatory actions prohibited.

¶ 43. Once a disability has been proven by the employee, the burden then shifts to the employer to prove a defense under Wis. Stat. § 111.34. *Id.*

¶ 44. In this case, there is no dispute among the parties that Catlin was disabled within the meaning of the WFEA, or that she was not allowed to return to work because of her disability. Also, it is uncontested that Catlin's disability was reasonably related to her adequately performing her job responsibilities, unless reasonable accommodations were made. The question remains whether, with reasonable accommodations Catlin must then be able to perform all of the job-related responsibilities adequately. Also left in question is whether or not there was a reasonable accommodation that Crystal Lake could have provided Catlin without hardship. Under LIRC's interpretation of "reasonable accommodation," it found that Crystal Lake could have modified Catlin's job duties to accommodate her disability. Catlin contends that a reviewing court may not make an independent determination of the facts,[17] and that the decision of LIRC should not be set aside unless it can be shown that the decision was not supported by substantial evidence. *Id.* at 11 (citing *Hamilton v. ILHR Dept.,* 94 Wis. 2d 611, 617, 288

Subject to ss. 111.33 to 111.36, it is an act of employment discrimination to do any of the following:

(1) To refuse to hire, employ, admit or license any individual, to bar or terminate from employment or labor organization membership any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment or labor organization membership because of any basis enumerated in s. 111.321.

. . . .

[17] *See Hixon v. PSC,* 32 Wis. 2d 608, 629, 146 N.W.2d 577 (1966).

N.W.2d 857, 860 (1980)). Crystal Lake, however, contends that this interpretation is unreasonable because it is being forced to create a new job to accommodate a disabled employee.

¶ 45. LIRC determined that Crystal Lake should modify Catlin's job duties and make physical modifications to the plant as a reasonable accommodation. Crystal Lake argues that, in this case, LIRC's interpretation of reasonable accommodation is unreasonable. Under Crystal Lake's alternate interpretation, an employer would only be required to assist an employee with his or her job responsibilities if there is some reasonable accommodation that will enable the employee to undertake all of his or her job duties. Crystal Lake argues that an employer would not be required to modify an employee's duties, or to exempt an employee from having to perform certain duties. Crystal Lake relies heavily on federal court decisions under the ADA in support of its interpretation. The basis for using the ADA in interpreting reasonable accommodation is, according to Crystal Lake, due to the similarity in language and purpose of the federal statute to the WFEA. Crystal Lake asserts that physical modifications to the plant and/or modification to Catlin's duties would have posed a hardship for the company. Catlin takes the position that Crystal Lake failed in meeting its burden of proving hardship.

B. Analysis

¶ 46. Though this court may look to federal law for guidance in determining if LIRC's interpretation of "reasonable accommodation" was reasonable, we are not bound by those cases in interpreting the WFEA. *Id.* at 18–19; *McMullen,* 148 Wis. 2d at 275–76. *See also American Motors Corp. v. ILHR Dep't,* 101 Wis. 2d 337,

353, 305 N.W.2d 62 (1981). The WFEA is a "remedial statute . . . [and] should be broadly interpreted to resolve the problem it was designed to address." *McMullen,* 148 Wis. 2d at 275. Also,

> the statutory language and scheme contained in the analogous . . . federal legislation differ[s], sometimes significantly, from that found in sec. 111.34(1)(b). . . . Our [The Wisconsin] legislature has established its own scheme for dealing with employment discrimination based on handicap and has articulated the specific policy considerations underlying that scheme. Therefore, we will construe sec. 111.34(1)(b) in accordance with our legislature's intention rather than with the intention of other jurisdictions.

*McMullen,* 148 Wis. 2d at 275–276. Clearly, this court is not bound by federal law in determining whether LIRC's interpretation of "reasonable accommodation" was appropriate.

¶ 47. The court of appeals has previously addressed the issue of interpretation of reasonable accommodation in both *Target* and *McMullen.* In each case, the court of appeals held that a reasonable accommodation was not limited to only an accommodation that would permit the employee to perform all of his or her job responsibilities.

¶ 48. In *Target,* the court upheld a decision by LIRC to "temporarily refrain from enforcing a disciplinary rule" against an employee as a reasonable accommodation. *Target,* 217 Wis. 2d at 18. The employee was unable, due to sleep apnea, to stay awake at times while performing her job duties. *Id.* at 5–6. LIRC determined that it was unreasonable to fire the employee without allowing time to see if treatment of the condition would correct the problem. *Id.* at 8–9. The employee's sleep apnea was reasonably related to her ability to perform

adequately her job responsibilities. However, the court upheld LIRC's decision as a reasonable accommodation, even though it did not immediately allow her to perform adequately her job duties. *Id.* at 16–18.

¶ 49. Similarly, in *McMullen,* the court of appeals required an employer to transfer an employee to a different position as a reasonable accommodation of the employee's disability. The court held that a " 'reasonable accommodation' may include a transfer of a handicapped employee to another position for which he is qualified, depending on the facts of each individual case." *McMullen,* 148 Wis. 2d at 271. This accommodation also did not allow the employee to perform his current job duties, but instead placed him in a job better suited to his current abilities. It was essentially a change or modification in the employee's job-related responsibilities.

¶ 50. In *Frito Lay, Inc. v. LIRC,* despite the fact that it was decided before the legislature added the reasonable accommodation requirement to the WFEA, the court of appeals held that arrangements made among other employees to accommodate one employee's disability, negated the employer's claim of an exception to the law against employment discrimination based on disability. *Frito Lay, Inc. v. LIRC,* 95 Wis. 2d 395, 407–08, 290 N.W.2d 551 (Ct. App. 1980). In that case, Frito Lay employed drivers, including the complainant, to make both interstate and intrastate deliveries from its warehouse in Beloit. *Id.* at 399. The complainant was a truck driver whose lack of visual acuity barred him because Wisconsin and Federal requirements differed for interstate, but not intrastate deliveries. *Id.* Delivery runs were allocated based on seniority, and all drivers senior to the complainant agreed to ensure that he had only intrastate runs. *Id.* The court held that this

229

accommodation did not allow the employer to discharge the complainant for failing to meet the federal (interstate) vision requirements. *Id.* at 408.

¶ 51. In this case, at least two of the three other employees in Catlin's department agreed that it would be feasible for them to accommodate a change in Catlin's duties because of her disability. This further supports the reasonableness, under *Frito Lay* and the current WFEA, of such a job modification.[18]

¶ 52. Based on the prior decisions in *Target, McMullen,* and *Frito Lay,* we hold that LIRC's interpretation of "reasonable accommodation" is not unreasonable, but rather is a reasonable one. A reasonable accommodation is not limited to that which would allow the employee to perform adequately all of his or her job duties. A change in job duties may be a reasonable accommodation in a given circumstance. *See Target,* 217 Wis. 2d 1; *McMullen,* 148 Wis. 2d 270. As we have determined LIRC's interpretation to be reasonable, under the "great weight" standard of review, we must, therefore, defer to LIRC's conclusion.[19]

---

[18] This court upheld the court of appeals' decision in *Frito Lay* by an evenly divided court. We recognize that the facts in *Frito Lay* are distinguishable from the case at bar. In *Frito Lay* the drivers chose their own truck routes based on seniority, and voluntarily left the intrastate routes to the complaintant in that case. In this case the job duties of Catlin's sister and mother are not determined by them, but rather, set by the employer, Crystal Lake. However, we still find *Frito Lay* persuasive in demonstrating that, even prior to the current version of the WFEA, this court upheld a voluntary re-arrangement of job responsibilities by the employees as reasonable. *Frito-Lay, Inc. v. LIRC,* 95 Wis. 2d 395, 290 N.W.2d 551 (Ct. App. 1980).

[19] The dissent attempts to lead us into a trap, involving the employee's ability to perform "some" as opposed to "most" or "all"

¶ 53. While we are satisfied that LIRC's finding of no hardship also deserves great weight deference, and is correct, we reserve a thorough discussion of the hardship issue for our review of issue three.

## VI. ISSUE TWO—DUE PROCESS

¶ 54. Crystal Lake argues that it was denied due process when LIRC rejected the hearsay testimony of Phillip Robertson, regarding the cost of constructing a wheelchair accessible bathroom. Crystal Lake contends that LIRC should have consulted with the ALJ regarding Robertson's credibility. Catlin, however, argues that Crystal Lake was not denied due process by LIRC's failure to consult with the ALJ regarding credibility issues, since LIRC's decision did not depend on the credibility of the witness. Because credibility was not the basis upon which the commission's decision hinged, the commission and the examiner were not required to consult. Rather, the testimony of Robertson was dismissed because it was uncorroborated hearsay. Catlin, therefore, asserts that LIRC was correct to reject the finding of the ALJ, since crucial findings cannot be based on hearsay testimony alone. *Village of Menomonee Falls v. DNR,* 140 Wis. 2d 579, 610, 412 N.W.2d 505 (Ct. App. 1987).

¶ 55. In support of her position, Catlin points out LIRC reached its decision because of its interpretation of how Wis. Stat. § 111.34 should be applied to the case, and that credibility was not a factor in reaching that decision. Crystal Lake had an opportunity to present its

job responsibilities. Dissent, ¶ 89, 113, 118, 127. The proper emphasis is on the employee's ability to perform her or his job responsibilities *adequately,* rather than on terms such as "some" or "most" or "all."

argument at the hearing and the ALJ ruled in its favor. Catlin argues that the fact that LIRC reached a result different than the ALJ does not mean that Crystal Lake's due process rights were violated. Simply put, there were reasonable alternative conclusions one could draw from the testimony and LIRC chose one that was different than the ALJ's. Consequently, Crystal Lake's due process rights were not violated by LIRC's decision.

¶ 56. Crystal Lake maintains that it was denied due process not only when LIRC failed to confer with the ALJ on issues of credibility, but when LIRC rejected evidence that was admitted without objection at the hearing. More specifically, Crystal Lake points out that while the ALJ determined that Catlin had to regularly perform the functions of the other positions in the department, LIRC determined the opposite without ever conferring with the ALJ. Crystal Lake argues that due process would have required LIRC to confer with the ALJ before reversing the ALJ's determination.

¶ 57. Essentially, Crystal Lake argues that LIRC's failure to consult with the ALJ prior to reversing the decision, as well as its rejection of Robertson's testimony on hearsay grounds, constituted a denial of due process and ultimately led to LIRC's finding that there was a reasonable accommodation that Crystal Lake could have provided without hardship.

¶ 58. Catlin argues that the LIRC decision did not depend on the credibility of witness testimony, but rather that LIRC interpreted the testimony in a different way. For example, rather than accepting the ALJ's determination that Catlin regularly assisted others in the wholesale department, LIRC only noted that the record did not indicate the "frequency" with which she assisted the other workers. Catlin argues that there were reasonable alternative conclusions one could draw

from the same testimony, and just because LIRC happened to reach a conclusion that was different from the ALJ, and against Crystal Lakes' interest, does not imply that Crystal Lakes' due process rights were violated.

¶ 59. Essentially, Catlin argues that LIRC reached its decision because of its interpretation of how Wis. Stat. § 111.34 should be applied to the case, and that credibility was not a factor in reaching that decision. As a result, LIRC did not violate Crystal Lake's due process rights.

¶ 60. We agree and hold that Crystal Lake was not denied due process by LIRC's failure to consult with the ALJ regarding credibility since LIRC's findings were not based upon the credibility of the operation manager's testimony. Rather, LIRC reached its decision because of its interpretation of how Wis. Stat. § 111.34 should be applied to this case. Put differently, the facts of the case and LIRC's interpretation of the statute were the real reasons for LIRC's decision. Thus, we hold that since LIRC's decision did not hinge upon witness credibility,[20] LIRC was not required to consult with the ALJ and, therefore, Crystal Lake was not denied due process.

## VII. ISSUE THREE—SUBSTANTIAL EVIDENCE—REASONABLE ACCOMMODATION WITHOUT HARDSHIP

¶ 61. Crystal Lake argues that LIRC's factual findings lacked evidentiary support in the record. In holding that Crystal Lake could have accommodated Catlin without hardship, LIRC found that Catlin could

---

[20] We strongly disagree with the dissent's attempt to turn LIRC's statutory interpretations into "credibility assessments." Dissent, ¶¶ 90, 133–136.

still perform most of her duties. Crystal Lake counters that this finding is against the evidence in the record. It maintains its position that Catlin regularly performed several activities, which LIRC found Catlin did only infrequently. Crystal Lake maintains that it is critical that Catlin should be able to perform not only her regular tasks, but all tasks for all positions in the department.

¶ 62. Additionally, Crystal Lake asserts that the record does not support LIRC's finding that neither physical modifications to the plant, nor modifications to Catlin's duties, would have posed a hardship to the company. It points to the $47,000 estimate for a wheelchair-accessible restroom, as well as the other plant modifications, as proof of hardship. Crystal Lake points out that the court of appeals acknowledged that modifying Catlin's duties may lead to production slow-downs. Crystal Lake disagrees, however, with the court of appeals that Crystal Lake fell short of proving hardship when it failed to go further and ensure there was evidence in the record of the consequences of such slowdowns.

¶ 63. Catlin maintains that LIRC, in this instance, has determined that there was substantial evidence to support its determination that reasonable accommodations were appropriate for Crystal Lake to make. LIRC found that Catlin could perform most of her duties, and that the duties Crystal Lake argues Catlin could not perform were not her regular responsibilities. Under LIRC's interpretation of the statutes, as long as Catlin could perform some of her duties, which the record indicated she could, then there were reasonable accommodations that could and should have

been made. Catlin felt that she would be able to perform most tasks that were part of her job with little or no accommodation.

¶ 64. Catlin asserts that Crystal Lake had no knowledge regarding what duties she was capable of performing, and never asked her what accommodations she thought she might need. Catlin contends that the WFEA has been found to include a duty to gather sufficient information from the employee and from qualified experts, as needed, to determine what accommodations are necessary. *Keller v. UW-Milwaukee,* No. 90–0140–PC–ER, (Wis. Personnel Comm'n. Mar. 19, 1993). Catlin argues that Crystal Lake failed to satisfy this duty. Crystal Lake was aware that Catlin had a disability and would require some sort of accommodation, but never approached her to inquire about what job duties she was capable of performing. Additionally, Catlin contends that Crystal Lake did not look at the possibility of transferring her to another position if it felt she could not adequately perform her job. She argues that such a transfer may also be a reasonable accommodation under the WFEA. Wis. Stat. § 111.34(1)(b).

¶ 65. She argues that with minor changes to the building and some assistive technology, she could have performed her job. Catlin asserts, and the Annis assessment points out, the easiest way to accommodate Catlin would have been to modify her job duties so that Catlin did not have to perform the more physically demanding tasks. Everyone in the department was cross-trained, and at least two of the three other team members acknowledged that they could make up for Catlin's restricted duties.

¶ 66. Based on the evidence contained in the record, Catlin argues that there was clearly a sufficient amount of credible evidence to support the findings of LIRC.

¶ 67. The complainant in a disability discrimination, under the WFEA, must show that: (1) he or she is handicapped under WFEA, and (2) that the employer has taken one of the enumerated, proscribed actions under the WFEA. *Target,* 217 Wis. 2d at 9. Once the complainant has made these two showings, the employer may proffer a defense that the accommodations named by the complainant would impose a hardship on the employer. *Id.* In such a case the employer has the burden of proving that hardship. *Id.* at 9–10. If the employer fails to prove this defense, it is in violation of WFEA.

A. Wisconsin Stat. § 111.34(1)(B) Hardship

¶ 68. Although Crystal Lake argues that reasonably accommodating Catlin would have resulted in a hardship for it, Catlin argues that Crystal Lake did not meet its burden of proving hardship pursuant to Wis. Stat. § 111.34(1)(b), nor did it meet its burden under Wis. Stat. § 111.34(2)(a). *Target,* 217 Wis. 2d at 10.

> [I]f an employer refuses to reasonably accommodate an employee's (or prospective employee's) handicap and is unable to demonstrate that the accommodation would pose a hardship, then the employer violates the WFEA. Wis. Stat. § 111.34(1)(b). Reading the two paragraphs of § 111.34 together, once the employee has met the first two showings, the employer must show either that a reasonable accommodation would impose a hardship —§ 111.34(1)(b), or that, even with a reasonable accommodation, the employee cannot "adequately undertake the job-related responsibilities"—§ 111.34(2)(a).

236

*Id.*

¶ 69. In support of her argument, Catlin points out that Crystal Lake did not offer any evidence showing that accommodating her would be a hardship for it. More specifically, Catlin points out that Crystal Lake offered no evidence showing that by exempting her from duties she could not perform it would suffer a hardship. Moreover, Catlin contends that Crystal Lake did not even explore accommodations it could have made for her, let alone show that any particular accommodation would impose a hardship upon it. Catlin states that the owner of Crystal Lake Cheese Factory, Curella, admitted as much in his testimony. Curella testified that he "didn't make any effort whatsoever for what might be appropriate accommodations for [Catlin] to return to work . . . ." (R. 14:4).

¶ 70. Furthermore, Catlin argues that restructuring her job duties would not have imposed a hardship on Crystal Lake since everyone in the four-person department was cross-trained in all tasks in the department, and that other members of the department were willing to perform the heavy physical tasks that Catlin could not do. The other department members did not object even if this meant they would get a disproportionate share of those duties. As noted previously, the other team members included Catlin's sister who already had the heaviest job as cutter, and Catlin's mother. Both of them were willing to perform the heavy physical tasks that Catlin could not do. LIRC found Crystal Lake could have accommodated Catlin without hardship by exempting her from performing the heavy physical tasks that were beyond her capabilities, and by making some physical modifications to the workplace. LIRC, Fair Employment Decision, Findings 16, 19, p. 4–5 (May 5, 2000).

237

¶ 71. In regard to the hearsay testimony that a new wheelchair accessible bathroom would cost $47,000, Catlin contends that Crystal Lake provided no documentation to support this figure. Moreover, Catlin argues that there was no evidence as to what Crystal Lake's financial resources were like. As a result, Catlin argues that it is possible that the $47,000 may not have been a significant cost for Crystal Lake, in relation to its financial situation. There was no evidence showing that Crystal Lake could not reasonably afford such an expense. While Crystal Lake argues that the alleged cost of the new bathroom would be three times Catlin's wages, Catlin contends that there is no legal basis for such an argument. Catlin points out that a new bathroom could be used by all employees. As such, Catlin argues that Crystal Lake failed to prove that accommodating her would impose a hardship on it.

¶ 72. Lastly, Catlin argues that the other necessary physical modifications that would be needed in order to accommodate her were relatively inexpensive. One modification included addressing the three-inch threshold on the entry door, something she claims could easily be remedied with a small ramp. Other modifications dealt with changes that could be made to the factory such as the lowering of tables and other items, and, where necessary, the widening of aisles.

¶ 73. In summary, Catlin agues that Crystal Lake did not meet its burden of proof that an accommodation would impose a hardship pursuant to Wis. Stat. § 111.34(1)(b).

¶ 74. In the present case, neither party disputes that Catlin is handicapped or that Crystal Lake took termination action based on that handicap. The issues, therefore, are whether the record supports, with substantial and credible evidence, LIRC's conclusion that

reasonable accommodations were available to Crystal Lake, accommodations that would allow Catlin to perform her job duties, and that Crystal Lake has failed to demonstrate that those reasonable accommodations would create a hardship for Crystal Lake.

## B. Analysis

¶ 75. In determining whether an employer is required, under the WFEA, to accommodate a disabled employee, the questions of reasonableness of the accommodation and hardship to the employer, while overlapping, are two "separate and distinct considerations that are to be addressed independently." *McMullen,* 148 Wis. 2d at 277. Thus, in examining the record for evidence to support each, we will also treat the two as distinct determinations.

¶ 76. In this case there is substantial evidence in the record to support LIRC's conclusion that, hardship notwithstanding, there were reasonable accommodations Crystal Lake could have taken in order to keep Catlin as an employee. Crystal Lake could have modified the jobsite to allow Catlin full access, and let her continue to perform those tasks she is still able to perform. Among the accommodations that could and should have been considered: a ramp, installed at the entrance, would allow wheelchair access; the tables and other fixtures could be lowered; the bathroom could be modified; and, where necessary, aisles could be widened.

¶ 77. When the state legislature modified the WFEA in 1981, it added provisions that require employers dealing with handicapped employees or applicants to evaluate the individual in order to determine whether he or she can meet the requirements of the job in question. Wis. Stat. § 111.34. Crystal Lake in this

239

case failed to investigate what Catlin herself could still do despite her disability. Johnson, the job analysis evaluator from Genex, was told only that he was to examine the job and job site with regard to a person in a wheelchair. At no time did Crystal Lake contact Catlin; in fact, there is evidence in the record that Crystal Lake managers avoided her phone calls. This failure by Crystal Lake appears to have been a violation of the intent of the WFEA.

¶ 78. Another way Crystal Lake could have accommodated Catlin's disability is by modifying her responsibilities. This is an accommodation, we hold, that appears to be reasonable under the circumstances here and within the purview of the WFEA. The other employees could divide among themselves those physical tasks Catlin is now unable to do, and she could focus just on the many job responsibilities that she can do. As noted, other employees have testified that they would be willing and able to do this.

¶ 79. Having found substantial and credible evidence in the record to support LIRC's finding that Crystal Lake could have reasonably accommodated Catlin, we now turn to the issue of hardship for Crystal Lake. As noted previously, we are satisfied that LIRC's determinations are entitled to great weight deference on this issue as well. Since Catlin has made the required showings that she is handicapped and that the employer has taken a proscribed action under the WFEA, the employer has the burden of showing hardship. *Target,* 217 Wis. 2d at 9.

¶ 80. As to physical and job modifications, Crystal Lake has failed in its burden to prove hardship. Further, we agree with the court of appeals that this matter should not be remanded to allow Crystal Lake to attempt now to make a new showing of hardship.

Crystal Lake chose to rely on what it argued was an erroneous interpretation of the WFEA by LIRC. Failed trial strategy is not grounds for remand. *See State v. McDonald,* 50 Wis. 2d 534, 538, 184 N.W.2d 886, 888 (1971).

## VIII. CONCLUSION

¶ 81. We affirm the decision of the court of appeals. Accordingly, we hold that requiring Crystal Lake to modify the job duties of Susan Catlin and make physical modifications to the workplace is not unreasonable and would be a reasonable accommodation. With such accommodations, she would have the ability to adequately undertake her job-related responsibilities.

¶ 82. Next, we hold that Crystal Lake was not denied due process when LIRC, prior to reversing the ALJ's holding, failed to consult with the ALJ regarding witness credibility issues. We hold that since LIRC's findings did not hinge on issues of credibility, LIRC was not required to confer with the ALJ, and that there was, therefore, no violation of Crystal Lake's due process rights. LIRC reached its decision here based on its interpretation of the proper application of Wis. Stat. § 111.34 to the facts presented.

¶ 83. Finally, we hold that there was substantial and credible evidence in the record to justify LIRC's findings. There was substantial evidence to show that Crystal Lake could have made reasonable accommodations for Catlin, and Crystal Lake has failed to meet its burden of establishing that such reasonable accommodations for Catlin would create hardship on it.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 84. DAVID T. PROSSER, J. *(dissenting)*. The majority opinion does not reasonably accommodate the interests and rights of Wisconsin employers.

¶ 85. By ruling in favor of Susan Catlin, the Labor and Industry Review Commission (LIRC) incorrectly interpreted the Wisconsin Fair Employment Act's (WFEA) ban on employment discrimination on the basis of disability. LIRC held that the WFEA requires an employer to "accommodate" an applicant or employee that cannot perform all the applicant or employee's necessary job responsibilities, *even with reasonable accommodations.* I strongly disagree with this interpretation of the WFEA and with the burden it imposes on employers.

¶ 86. Today, a majority of this court affirms this statutory misinterpretation—made in the first instance by an administrative agency—and adopts this erroneous approach as the law of this state. In the process, the court has taken from Wisconsin employers the ability to define the required job duties of their employees. This is a result altogether unintended by the WFEA.

¶ 87. I disagree with the majority in three primary respects.

¶ 88. First, LIRC and its companion agency, the Wisconsin Personnel Commission, have not consistently ruled that removing necessary elements of an employee's job can be considered a reasonable accommodation under Wis. Stat. § 111.34(1)(b) that is consistent with § 111.34(2)(a). Therefore, I would grant only due weight deference to LIRC's interpretation of how § 111.34 governs adverse employment actions taken against an employee or applicant that cannot perform all the necessary functions of the job for which she applies or for which she is already hired.

¶ 89. Second, LIRC's interpretation of § 111.34 in this case is manifestly less reasonable than a readily understandable alternative meaning. Section 111.34(2)(a), even when read in conjunction with § 111.34(1)(b), cannot be read to require that an applicant or employee need only be able to perform "some" or "most" of the basic responsibilities of the job that he or she fills in order to compel an employer to hire or retain that person. Rather, the reasonable accommodations contemplated by § 111.34 are those that assist the disabled employee's ability to perform a preexisting job. "The job" is defined by the basic duties that are incumbent upon the employment.

¶ 90. Finally, it was impermissible for LIRC to find unlawful discrimination on the basis of factual conclusions that were inconsistent with those reached by the administrative law judge (ALJ) without having first conferred with the ALJ. LIRC's factual findings regarding the nature of the job responsibilities that the complainant could or could not perform after her accident were based predominantly on testimony from the complainant herself and others. To declare that these findings are not based on credibility assessments is astounding.

¶ 91. For these reasons, I respectfully dissent.

## I. RESTATEMENT OF THE FACTS

¶ 92. As an initial matter, I must highlight the central factual matter at issue in this case: what responsibilities of Catlin's job could she perform after an injury confined her to a wheelchair, and what duties could she not perform, even with reasonable accommodations?

¶ 93. Catlin's job was lead worker/supervisor of Crystal Lake Cheese Factory's wholesale department.

As the supervisor of this four-person department, Catlin's job required her to perform a variety of duties.

¶ 94. The majority has adopted LIRC's findings as to Catlin's ability to perform adequately "most" of her job duties following her accident. LIRC concluded that, as of the date she sought reinstatement, Catlin could (1) train employees; (2) make boxes; (3) make labels; (4) bake cheese; (5) label cheese (if she used a "reacher" to get at the labels); (6) weigh cheese; (7) price cheese; (8) box cheese; (9) put the cheese on pallets; (10) do inventory and other paperwork; and (11) clean up and wash equipment. Catlin's testimony during the hearings before the ALJ supports LIRC's findings that Catlin could, as a purely quantitative matter, perform these tasks.

¶ 95. There also is a nontrivial number of duties that LIRC found—and which Catlin has admitted— that she could not perform. Catlin could not perform "some" of the heavier physical tasks, including (1) lifting 40–pound blocks of cheese; (2) loading and unloading cheese onto hand carts and semi trucks; (3) reaching boxes stacked high in the storeroom; (4) reaching cheese stacked high in the cooler; (5) cutting cheese; and (6) placing the cheese in the hot-water bath to shrink-wrap it. LIRC proclaimed that the last two duties were not ones that Catlin performed "very frequently," as they were primarily the jobs of the cheese cutter and "cryovacer." Conspicuously absent from either of LIRC's lists is the vacuum-bagging role of the cryovacer, which involves the operation of a cryovac machine. In addition, prior to her accident Catlin had assisted in moving cheese by use of a handcart and

loading it on a pickup truck to go to the retail store.[1] After her accident, Catlin was unable to perform either of these two functions as well.

¶ 96. In all, there is no disagreement between the parties or their respective experts that Catlin was physically unable to perform a fair number of her job duties, *even with reasonable accommodations.*

¶ 97. In determining whether Catlin could undertake her job responsibilities adequately, it appears that LIRC took mostly a quantitative approach. LIRC simply counted the number of duties Catlin could perform, added to this number those duties that she could perform with accommodation, and then compared this total to the number of jobs that she could not perform. Accordingly, it determined that Catlin could perform "most" of her job functions. This analytical technique is suspect, because it fails to account for the amount of time that Catlin spent daily on each of the jobs and the relative importance of each of the tasks that she was required to perform. Rather than engaging in such an analysis of assigning weight to Catlin's job requirements, LIRC slapped the ambiguous modifier "most" on the number of duties that she could still do and concluded that the duties she could not do anymore were those that she had performed "not very frequently."

¶ 98. There is mostly ambiguous testimony regarding how often and for what length of time Catlin engaged in any of her duties. As a result, it is difficult to determine how the performance of each of these tasks relates to Catlin's ability to adequately perform the

[1] This pickup truck loading process apparently took place primarily, though not exclusively, at Christmas time.

functions that are necessary to her position.[2] However, we do know the amount of time that she spent on one of her tasks; we know that she only spent about one to one-and-a-half hours at the beginning of her day handling her general paperwork and administrative duties. According to the "modifications" recommendation of Catlin's expert, however, these "paperwork" duties would have constituted the majority of Catlin's job upon her "accommodation."[3]

¶ 99. In any event, Catlin and several other witnesses testified that one of the primary responsibilities of the four employees in this department was to undertake the jobs of the other three employees in the event

---

[2] One duty that LIRC "found" Catlin able to do was "train." Catlin testified that there was a man who was not cross-trained when she began in the wholesale department. Because Catlin was the lead worker, it is assumed that she took on the cross-training of this individual. This is the only instance in which Catlin indicated that she may have previously engaged in training, and even this is an assumption. Yet "training" is one of LIRC's findings of what Catlin could do after her injury. To be sure, it was also found that Catlin could no longer aid in loading and unloading trucks. There is some testimony that she only needed to do this occasionally, especially around December. It would seem that these two, relatively minor functions would cancel each other out.

[3] According to Jeffrey Annis, the rehabilitation technologist who conducted an assessment of Catlin's job site and job capabilities for Catlin:

> As far as I can see, the only opportunity [Catlin] would have had to return to that position is if there would have been numerous accommodations put in place. The easier option would be to make modifications to her job description *so she would be required,* as lead person, *to only do the paper work, final packaging, and filling out invoices, receipts, and packing lists.*

(Emphasis added.)

246

of a temporary absence or if another employee were falling behind and needed help. For example, Catlin testified that she often "jumped in" to take 40–pound blocks of cheese to and from the cooler and that some days she would do this "a couple of times a day." This task required her not only to lift the blocks but also to reach to the higher shelves in the cooler. Naturally, the ability of these four employees to work together and to work smoothly by filling in when needed was essential to the efficiency of the department's production process. In all, Catlin assisted with all the duties of the wholesale department on a daily basis and many of these duties she could no longer perform after her accident.

¶ 100. Nevertheless, LIRC concluded that Catlin could be assigned to performing all but the "heaviest physical tasks" in a department where such tasks are commonplace and where all employees, including Catlin, were required to perform each other's duties on a daily basis. Of course, LIRC's conclusion is based on a different view of the facts than that of the ALJ who first heard this case. Of particular concern is the difference between how the ALJ and LIRC characterized the frequency by which Catlin assisted other members of the department, including help with the "heavy physical tasks." The ALJ concluded in his findings of fact that each employee in the department *regularly* had to assist each other to keep work flowing smoothly and cover for each other when temporary absences occurred." Meanwhile, LIRC concluded that the duties which Catlin could not perform were tasks that she did not do "very frequently" and were those that she "helped out only occasionally." Well, which is it?

## II. LEVEL OF DEFERENCE

¶ 101. The majority begins its analysis by incorrectly finding that LIRC's legal conclusions in this case are entitled to extremely deferential treatment under the "great weight" standard of review. As this court has previously stated:

> Great weight deference is appropriate once a court has concluded that: (1) the agency was charged by the legislature with the duty of administering the statute; (2) that the interpretation of the agency is one of long-standing; (3) that the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) that the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 660, 539 N.W.2d 98 (1995); *see also UFE v. LIRC,* 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996); *Linsey v. LIRC,* 171 Wis. 2d 499, 505, 493 N.W.2d 14 (1992). LIRC has failed to meet the second and fourth prongs of the test. Thus, I would conclude that great weight deference is an inappropriate standard of review.

¶ 102. Though LIRC has experience in interpreting Wis. Stat. § 111.34, LIRC's interpretation of the statute on matters related to this issue is not one of "long standing." Therefore, LIRC does not satisfy the second prong of the test. I believe that "[t]his is precisely the situation that warrants due weight deference: LIRC has had some experience interpreting [Wis. Stat. § 111.34], yet has not faced the particular circumstances we have here." *Brauneis v. LIRC,* 2000 WI 69, ¶ 19, 236 Wis. 2d 27, 612 N.W.2d 635.

¶ 103. Indeed, LIRC has yet to address the specific issue of whether "reasonable accommodation" un-

der the WFEA includes a duty to eliminate multiple, basic job duties of an employee and to create a wholly different, previously nonexistent job for a disabled employee. LIRC incorrectly cites *Fields v. Cardinal TG Co.*, ERD Case No. 1997–02574 (LIRC Feb. 16, 2001), as conclusive support for the proposition that LIRC has held a reasonable accommodation to require an employer to restructure the physical demands of the job in order to accommodate a disabled employee. Even putting aside that *Fields* was decided well *after* the evidentiary hearing in this case, that case actually held that an employer may not *restructure* the job of a disabled employee such that the employee is no longer able to perform it because of a disability.

¶ 104. Outside of *Fields,* LIRC cites no legal authority or precedent from its own opinions to directly support its prior history of following the rule it presently advances. Thus, while LIRC may have addressed cases that are similar to this question, this is the first occurrence under these particular circumstances. Therefore, great weight deference should not be afforded to LIRC's interpretation. *See Local No. 695 v. LIRC,* 154 Wis. 2d 75, 81, 452 N.W.2d 368 (1990).

¶ 105. To the extent LIRC has addressed issues related to modifying jobs as a means of accommodating an employee's disability, it has a spotty history of providing uniformity and consistency in applying § 111.34. In *McMullen v. LIRC,* 148 Wis. 2d 270, 434 N.W.2d 830 (Ct. App. 1988), LIRC was given no deference in its interpretation of § 111.34 due to its inconsistent statements regarding whether a reasonable accommodation could ever include an employee's transfer to another position. *Id.* at 274. LIRC had stated in its own decision in the matter that transferring a disabled employee to another position may be considered a

reasonable accommodation. *Id.* When facing the court of appeals, however, LIRC reversed its position and argued that an employer's duty to accommodate could *never* include a transfer. *Id.* Not only did LIRC contradict itself within the framework of a single case, it did so on a topic similar to the issue in this case.

¶ 106. Indeed, *McMullen* is not the only case illustrating LIRC's limitations when interpreting § 111.34 on issues related to the present case. In *Macara v. Consumer Co-op,* ERD Case No. 8802872 (LIRC Feb. 14, 1992), LIRC held that the duty to accommodate does not require creating a position or discharging another employee to allow for a transfer of a disabled employee. Meanwhile, in 1988, the Wisconsin Personnel Commission, LIRC's sister agency, had analyzed § 111.34(2)(a) in light of § 111.34(1)(b) and ruled that the WFEA does not require an employer to create a new job or reassign job duties to other staff as a reasonable accommodation. *Harris v. DHSS,* Case No. 84–0109–PC–ER (Wis. Personnel Comm'n Feb. 11, 1988). Rather, "the employer's obligation is limited to the job-related responsibilities of the handicapped individual's employment vis-à-vis the particular job he or she occupies or for which he or she is applying." *Id.* at 14–15. In both of these decisions, the foregoing conclusions were not particular to the facts of the case but were offered as general legal principles.

¶ 107. If nothing else, this history indicates inconsistency in agency interpretations of Wis. Stat. § 111.34 on this matter. "[S]pecial deference to be afforded an agency is the result of a course of uniform interpretation over a period of time." *Local No. 695,* 154 Wis. 2d at 84. Given the preceding history, there has hardly been uniform application of § 111.34 by LIRC and the Wis-

consin Personnel Commission. Therefore, due weight should clearly be afforded in this case.

¶ 108. Under the due weight standard, "a court need not defer to an agency's interpretation which, while reasonable, is not the interpretation which the court considers best and most reasonable." *Harnischfeger,* 196 Wis. 2d at 660 n.4; *see also Brauneis,* 236 Wis. 2d 27, ¶ 20 ("Pursuant to due weight deference, an agency's statutory interpretation is accorded some weight, but is not conclusive."). This court is not bound by LIRC's statutory interpretation. *See Brauneis,* 236 Wis. 2d 27, ¶ 15. "The fact that the agency's interpretation is reasonable does not mean that its interpretation will necessarily be upheld. If a court finds an alternative interpretation more reasonable, it need not adopt the agency's interpretation." *UFE,* 201 Wis. 2d at 287. Therefore, if this court finds, by means of its own independent analysis, an alternative interpretation that is more reasonable, then it need not adopt the agency's interpretation.

¶ 109. By adopting an incorrect level of deference regarding LIRC's legal conclusion, this court has abdicated its role to define the law established under Chapter 111 and has passively allowed the establishment of a wholly less reasonable interpretation of the law. At a minimum, given the inconsistency of the administrative agencies addressing similar issues, and the lack of LIRC decisions addressing this precise issue, this court should have engaged in an independent review of what § 111.34 demands on this question.

## III. PROPER APPLICATION OF WIS. STAT. § 111.34

¶ 110. The WFEA prohibits employment discrimination on the basis of disability. *See* Wis. Stat. §§ 111.321, 111.34. Accordingly, it is unlawful employ-

251

ment discrimination to "refus[e] to reasonably accommodate an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation would pose a hardship on the employer[] . . . ." Wis. Stat. § 111.34(b).

¶ 111. However, the legislature has provided affirmative defenses to a WFEA claim of employment discrimination based on disability. In the present case, we need only look at § 111.34(2)(a), which states:

> Notwithstanding s. 111.322 [the prohibition against employment discrimination], it is not employment discrimination because of disability to refuse to hire, employ . . . to bar or terminate from employment . . . any individual . . . if the disability is reasonably related to the individual's ability to adequately undertake *the job-related responsibilities of that individual's employment* . . . .

Wis. Stat. § 111.34(2)(a) (emphasis added).

¶ 112. The majority quite accurately describes the relationship between §§ 111.34(1)(b) and 111.34(2)(a), stating: "Taken together, [the provisions] require an employer to prove that even with reasonable accommodations, the employee would not be able to perform *his or her job responsibilities,* or that, where reasonable accommodations *would enable the employee to do the job,* hardship would be placed on the employer." Majority op., ¶ 32 (citing *Target Stores v. LIRC,* 217 Wis. 2d 1, 17, 576 N.W.2d 545 (Ct. App. 1998)) (emphasis added). Unfortunately, the majority fails to apply the foregoing standard and, in the process, adopts LIRC's improper application of § 111.34. LIRC's approach rewrites the statute to generate a nonexistent requirement that employers retain or hire someone who is unable to perform the responsibilities of any existing job, even with reasonable physical accommodations.

¶ 113. Crystal Lake *has* met the requirements of § 111.34(1)(b) and § 111.34(2)(a), even under the formulation articulated by the majority. First, Catlin *is* unable to perform all her existing job responsibilities, much less perform them all adequately as required by § 111.34(2)(a). Second, Catlin is unable "to do *the* job" that she has been performing. Instead, she is only able to perform a new and more limited job—one that is substantively different from her prior position.

¶ 114. As discussed earlier, Catlin is now unable to do significant, daily elements of her job. In particular, she is now frequently unable to "step in" and assist other members of the department to keep production going smoothly. It is unreasonable to interpret § 111.34 to require Crystal Lake to retain an employee who, by virtue of her disability, is unable to perform these necessary elements of her job and to create a job devoid of these duties, when no such job previously existed.[4]

¶ 115. LIRC itself has argued as much, and in a situation much more favorable to an employee's protections under § 111.34. In LIRC's brief before the court of appeals in *McMullen,* a case that is discussed above, LIRC argued that "the duty to accommodate an employee's handicap under the WFEA . . . does not

[4] Would this court have reached the same decision if Crystal Lake declined to hire someone for the wholesale department's lead position because that applicant suffered from Catlin's disability and was unable to do the same elements of the job that Catlin was unable to perform? The WFEA applies equally to applicants as it does to current employees. Wis. Stat. § 111.32(1). After today's decision, a Wisconsin employer must be prepared to post job openings in which it may ultimately be required to hire someone who, even with accommodations, will not be able to perform the duties attributed to that position.

require an employe to transfer the employe to a different job." Brief of LIRC at 24, *McMullen v. LIRC,* 148 Wis. 2d 270.

¶ 116. To be sure, some job responsibilities may not be necessary, in that they do not fundamentally alter the job being performed. Nevertheless, as a general matter, the reasonable accommodations required under § 111.34(1)(b) must go to aiding the employee or applicant in performing the job responsibilities for which they are, or will be, hired. There will be times when an employer will have to endure additional costs to reasonably accommodate an individual so that the employee can perform all of his or her job duties. Because of the additional cost of employing this individual over someone who would not require accommodation, the employer would likely prefer, as a economic matter, not to hire the disabled person. The WFEA, however, has made this type of discrimination unlawful. It is this protection that is wisely provided by the WFEA.

¶ 117. What the WFEA does not make unlawful is an employer's decision not to hire or retain an employee who, because of his or her disability, cannot perform the necessary duties of the job, *even with all reasonable accommodations.*

¶ 118. The questionable reasoning of LIRC's interpretation is seen in the circularity of the majority's holding, in which it states, "we hold that requiring Crystal Lake to *modify the job duties* of Susan Catlin and make physical accommodations to the workplace, was not unreasonable. With such reasonable accommodations, she would have the ability *to undertake,* adequately, *her job-related responsibilities.*" Majority op., ¶ 3. Assuming that "job duties" and "job responsibilities" are synonymous, how can Catlin undertake her

job-related responsibilities, "adequately" or otherwise, if she does not need to perform those responsibilities? LIRC and the majority use "modify" as a euphemism so as to require Crystal Lake to eliminate multiple, basic duties of the job for which Catlin was hired. Even worse, the majority endorses the nebulous notion that an employee or applicant need only perform "some" or "most" of his or her job duties.[5]

¶ 119. Catlin and LIRC also misconstrue the well-expressed legislative intent of the WFEA. The WFEA does not mandate the full employment of people with disabilities per se. It encourages the full employment of *properly qualified* persons with disabilities. Wis. Stat. § 111.31(3). Catlin and LIRC consistently argue for—and the majority apparently grants them—an interpretation of § 111.34 that effectuates a purpose in the WFEA whereby Crystal Lake is required to give Catlin some job—any job—even one that does not fit within the structure of the business enterprise. This outcome *is not what the WFEA intends for persons who are* unable to perform a job. By virtue of her injuries, Catlin was not properly qualified to perform the job for which she was hired; nor could she have been reassigned to another job that was open for which she was qualified.

¶ 120. Catlin does *not* argue that reasonable physical accommodations would adequately and reasonably compensate for her disability and thereby allow her to perform the necessary functions of her job. Therefore, even if the court finds that the physical accommodations demanded by Catlin and LIRC are not

---

[5] This answer is inconsistent with the majority's formulation of the primary issue in this case, which it describes as: "whether, with reasonable accommodations Catlin must then be able to perform all of the job-related responsibilities adequately." Majority op., ¶ 44.

unreasonable and do not impose a hardship,[6] § 111.34(2)(a) still requires that the employee be able to actually do the necessary functions of the job with those accommodations. Again, it is conceded that Catlin is unable to do many of the necessary duties of her job that she had performed daily.

¶ 121. The inescapable effect of LIRC's ruling is that Crystal Lake must either (1) have nobody perform the duties that Catlin used to do, and thereby decrease productivity; (2) hire a new employee to do these duties and incur unnecessary costs[7]; or (3) have other existing employees undertake the duties that Catlin can no longer perform, thereby taking these employees away from the duties they would otherwise be performing. Each of these options necessarily imposes hardship on an employer in a manner that § 111.34(2)(a) expressly states need not occur.

¶ 122. Businesses must worry about profit, which is achieved through efficiency. Crystal Lake assigned specific job duties to the individuals in Catlin's department, presumably to increase efficiency. Indeed, all the members of the department were cross-trained in all the other jobs in order to be more efficient and diverse in their roles in the production process. Take away one of the components in this process, and an intimate,

---

[6] I do not concede that Crystal Lake has failed to establish hardship based on the physical accommodations required of the facility to handle Catlin's needs.

[7] LIRC stated in its Memorandum Opinion that Crystal Lake failed to establish that it would have needed to hire additional help if Catlin was permitted not to perform all her duties. However, before the ALJ, Phillip Robertson, Crystal Lake's operations manager, directly testified that the company would have been required to hire additional help in this situation.

finely tuned, production process loses the level of productivity set by the employer for this four-person unit.

¶ 123. As the majority admits, all four workers in Crystal Lake's wholesale department were cross-trained in all four positions, "and all were capable of assisting one another when an employee fell behind, or when the department was busier than usual." Majority op., ¶ 8.[8] This "assistance" is a requirement of each person's job, not a matter of mere "capability." By virtue of Catlin's disability, which confines her to a wheelchair, she is now frequently incapable of assisting other employees in the department as needed. How, then, can she perform these necessary elements of her job?

¶ 124. Remarkably, LIRC and the majority twist the significance of this cross-training to make much out of the not-so-surprising testimony that Catlin's mother and sister would "help" with the job duties that Catlin could not do.[9] Majority op., ¶¶ 70, 78. This discussion is irrelevant and inappropriate. Section 111.34(2)(a) addresses the ability *of the employee or applicant at issue* to "adequately undertake the job-related responsibilities of that individual's employment." In addition, it

---

[8] We would add to these circumstances assisting each other at times when an employee was absent, either due to illness or to other demands of the job.

[9] In fact, the majority states that Catlin argued that "[t]he other department members did not object even if [performing Catlin's heavy physical tasks] meant they would get disproportionate share of those duties." This appears to be an overstatement, as only two of the three other members (Catlin's mother and sister) testified that they would agree to do so. In addition, this testimony, besides being inherently biased, is speculative, because by the time of the hearing in this case, Crystal Lake had apparently eliminated the wholesale department at which these employees worked.

ignores the fact that such "accommodation" necessarily diverts Catlin's mother and sister from their own duties.

¶ 125. Finally, there has been much ado about nothing related to Crystal Lake's method of determining if Catlin could have been accommodated. It is not necessary in this case that Crystal Lake, when it assessed whether Catlin could be reasonably accommodated to perform her job, talk with Catlin or inform the professional evaluator anything more about her disability than that she was confined to a wheelchair. In some instances, such as this case, there are certain realities in what a person confined to a wheelchair is physically unable to do, even with all reasonable physical accommodation.

¶ 126. It is telling that the majority offers no authority to directly support the reasonableness of LIRC's interpretation of § 111.34. Contrary to what the majority asserts, the cases it cites do not hold "that a reasonable accommodation [is] not limited to only an accommodation that would permit the employee to perform all of his or her job responsibilities." Majority op., ¶ 47.

¶ 127. *Target Stores*, 217 Wis. 2d 1, involved a temporary and treatable disability. The court of appeals held in favor of the complainant, even though the accommodation would not allow the complainant to perform all her job duties immediately. *Id.* at 14. However, the complainant's disability (sleep apnea) was a temporary one that was treatable. After a short treatment period, the employee would have likely been able to perform all her job duties. *Id.* at 7. It is unlikely that Catlin's rehabilitation will ever allow her to per-

form all her job duties, in either the short-term or long-term future. *Target Stores* is clearly distinguishable.

¶ 128. In *McMullen v. LIRC*, 148 Wis. 2d 270, 434 N.W.2d 830 (Ct. App. 1988), the complainant was seeking a transfer to an open position for which he was qualified. The court held that a reasonable accommodation may include a transfer to an open position for which the employee is qualified, though, depending upon the facts of each individual case, such transfer may also be considered a hardship. *Id.* at 271. The majority's assertion that Catlin's required accommodation is similar to what occurred in *McMullen* and "was essentially a change or modification in the employee's job-related responsibilities," majority op., ¶ 49, is inaccurate. In *McMullen* there was a transfer to a different, vacant position that the company needed to fill anyway. Catlin is not requesting a transfer to an existing, open position for which she is qualified. She is asking for her old job back, with certain daily job responsibilities eliminated because she can no longer adequately perform them, even with accommodation. This is a critical distinction from *McMullen*.

¶ 129. Finally, in *Frito Lay, Inc. v. LIRC*, 95 Wis. 2d 395 (Ct. App. 1980), the issue of accommodation was not one in which any new job was created; rather the complainant was once again reassigned to a position that he was qualified to fill—namely, driving intrastate trucking routes rather than driving interstate routes, which his disability prevented him from doing.

¶ 130. In all, unlike *Target Stores, McMullen,* and *Frito Lay,* the position that LIRC and the majority opinion claim that Catlin should "fill" did not exist at the time of her injuries, did not exist when Crystal Lake

was assessing whether Catlin could be adequately accommodated to do *her* job, and exists now only by fiat of LIRC.

¶ 131. In all, LIRC's interpretation of § 111.34, as adopted by the majority, is highly questionable and imposes an unreasonable burden on Wisconsin businesses. Section 111.34 cannot be read to require that an applicant or employee only be able to perform "some" or "most" of the necessary responsibilities of the job. *See* majority op., ¶ 63. Rather, a reasonable accommodation under § 111.34(1)(b), when read together with § 111.34(2)(a), is one that permits an employee to perform adequately all of his or her necessary job duties or, in some instances, to perform all the necessary job duties of another existing job. Under the facts of this case, Crystal Lake has fully met its burden under § 111.34(2)(a) of demonstrating that Catlin's disability is reasonably related to her ability to adequately undertake *the* job responsibilities of her employment.

## IV. DUE PROCESS & SUBSTANTIAL EVIDENCE

¶ 132. The majority opinion concludes by rejecting Crystal Lake's contention that LIRC improperly reached its decision by failing to confer with the ALJ regarding evidence submitted before the ALJ. The majority states that LIRC's findings did not "hinge on issues of witness credibility," and therefore LIRC was not required to consult with the ALJ. Majority op. ¶¶ 4, 54.

¶ 133. The majority errs, however, in suggesting that the only element of credibility at issue was that of Crystal Lake's operations manager, Phillip Robertson, regarding the cost of constructing a wheelchair-accessible bathroom. This is incomplete. The credibility

assessments required for LIRC to reach its conclusions involved other matters. Of primary importance are the conflicting findings regarding the frequency by which Catlin had performed the job responsibilities that she could not perform after her accident. LIRC's factual findings regarding which job responsibilities the complainant could or could not perform after her accident, even with physical accommodation, were based almost completely on testimony from the complainant. *See* majority op., ¶ 63 ("Catlin felt that she would be able to perform most tasks that were part of her job with little or no accommodation."). From this, LIRC concludes that Catlin could perform "most" of her duties. *See* majority op., ¶ 63.

¶ 134. The problem is that this ultimately dispositive factual finding, which is of questionable reliability and is based on credibility assessments, is then applied to LIRC's new and incorrect interpretation of § 111.34. It is telling that even the majority seems tentative on this conclusion, stating "Crystal Lake could have accommodated Catlin's disability [ ] by modifying her responsibilities. This is an accommodation, we hold, that *appears* to be reasonable under the circumstances and within the purview of the WFEA." Majority op., ¶ 78 (emphasis added).

¶ 135. Even if LIRC's interpretation of § 111.34 were correct, the ALJ based his assessment not solely upon an adoption of Crystal Lake's theory of law, but also on his findings that the job duties that Catlin could not now perform were ones she used to do "regularly." Therefore, LIRC needed to consult with the ALJ to determine the basis upon which it reached a different

factual conclusion on this matter.[10] *See Hermax Carpet Marts v. LIRC,* 220 Wis. 2d 611, 617, 583 N.W.2d 662 (Ct. App. 1998); *Hoell v. LIRC,* 186 Wis. 2d 603, 614, 522 N.W.2d 234 (Ct. App. 1994). Again, even under LIRC's interpretation of § 111.34, this factual determination was critical. Furthermore, Catlin, LIRC, and the majority have each relied on testimony from Catlin's mother and sister, who happen to be two of the three other employees in the wholesale department, who claimed that they could "pick up the slack" and cover Catlin's job duties as needed. Majority op., ¶ 29. The credibility of these statements is also at issue.

---

[10] As but one example of Catlin's testimony that undermines LIRC's "not very frequently" finding is the following:

[ATTORNEY GROISS]: Now you indicated . . . that the cutting of the cheese was a cutter's responsibility, and you say you didn't— you rarely had to cut the cheese, but you took it upon yourself to do that; is that correct?

[CATLIN]: Yes.

[GROISS]: And when you're talking about this—this—this cutting of the cheese, when you say "rarely," you would be cutting cheese several times during the course of the week, would you not, as a normal course of your job function?

[CATLIN]: Not several, no.

[GROISS]: What, once a week? You have no answer?

[CATLIN]: It's a hard question to answer.

[GROISS]: And that's because you're always doing these various functions; is that correct?

[CATLIN]: If we get busy, yeah.

[GROISS]: You're always being asked to fill in this instance and do these various jobs; is that correct?

[CATLIN]: Yeah.

¶ 136. These findings, it seems to me, are undoubtedly based on credibility assessments. Therefore, I disagree that it was permissible for LIRC to reach factual conclusions without having conferred with the administrative law judge, whom LIRC ultimately reversed. At a minimum, this case should be remanded so that LIRC can be required to consult with the ALJ and to determine why LIRC and its administrative law counterpart reached two different assessments regarding the nature of the duties Catlin could and could not do and to determine if the ALJ's conclusion was based on more than merely an adoption of a different rule of law.

¶ 137. I am authorized to state that JUSTICES JON P. WILCOX and DIANE S. SYKES join this dissent.